IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ANNE LEHR,**                                      Case No. 1:16 CV 431

      Plaintiff,

      v.                                  Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                          MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Anne Lehr ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction. (Doc. 10). For the reasons stated below, the undersigned affirms the Commissioner's decision.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in January 2013, alleging a disability onset date of March 1, 2009. (Tr. 129-35). Her claims were denied initially and upon reconsideration. (Tr. 93-95, 97-99). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 100). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on February 19, 2015. (Tr. 27-67). On March 24, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 13-20). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3); 20 C.F.R. §§ 404.955, 404.981. Plaintiff filed the instant action on February 24, 2016. (Doc. 1).

**FACTUAL BACKGROUND**

***Personal Background and Testimony***

Plaintiff was 52 years old at her alleged onset date of disability. (Tr. 69). She has a college degree (Tr. 155), and previously worked as a bakery clerk and animal shelter worker (Tr. 177).

Plaintiff could sweep the floor, but not for "too long". (Tr. 35). She could fold the laundry and put it away, but her husband had to carry it for her. (Tr. 36). She could not vacuum and could not grocery shop "because [she] can't carry anything really heavy or even mildly heavy." *Id.* She could prepare her own meals and load her dishes into the dishwasher. (Tr. 36-37). Plaintiff was able to drive. *Id.*

On a typical day at the time of the hearing, Plaintiff "tend[ed] to stay in bed as long as [she] [could] because the minute [she] get[s] up it starts and it just gets worse." (Tr. 38). She then has coffee and makes herself a smoothie for breakfast, before checking both the postal mail and her e-mail. *Id.* She sweeps the office and scoops the cat litter box, and then takes a shower. (Tr. 38-39). She watches television and reads during the day, and is "pretty much sitting." (Tr. 39). Plaintiff testified that "even if [she's] just sitting, it hurts." (Tr. 37).

Plaintiff testified that prior to 2009, she was more active and exercised regularly. (Tr. 51-52). Plaintiff testified that between 2009 and September of 2011, her biggest problem preventing her from work was "[p]ain in [her] side joint area, both right and left, although the right side seemed to be worse". (Tr. 47). The pain was "from the hip down" though it would "sometimes go up [her] back midway". *Id.* Plaintiff also had knee pain. *Id.*

Plaintiff testified that in 2010 she started to do yoga (at the suggestion of her chiropractor) to help with shoulder pain. (Tr. 48). She went to a few classes and then did yoga at home on her own. *Id.* Plaintiff testified that she "discontinued it since [she had] started to get this neck pain and

2

that was like a month-and-a-half ago." (Tr. 49). She stated the yoga "was helping, but after a while it was like [she] was doing it only just to calm [her] mind to try to release tension out of [her] body, but . . . it did not[ solve[] her problems and ma[k]e all the pain go away." (Tr. 53). Plaintiff also testified that she had tried physical therapy and did what she was told, "but it was just making things worse." (Tr. 49). Plaintiff used to have an elliptical machine at home, but she "got rid of it at least two years" prior because she could no longer use it due to it hurting her hips and SI joints. (Tr. 50-51).

Plaintiff underwent some injections, which initially provided relief, but subsequent times did not. (Tr. 54).

Plaintiff estimated that for the period of 2009 to 2011, she could stand or walk for about 30 minutes before having to sit down. (Tr. 54-55). She testified that she "never did more than five minutes at a time" on the elliptical, "when [she] was able to do it at all." (Tr. 55). She estimated that during that time period, she could sit a little longer than she could at the time of the hearing but "would still always have to change positions because it would just start again to feel uncomfortable." *Id.* Again, during that time period Plaintiff "would avoid lifting anything that felt too heavy and honestly, . . . because [she] had hernias in the past, [she] was always advised [not to] lift anything over ten pounds ever." (Tr. 56). Her most comfortable position during that time period was on a recliner with some pillows for pain relief. (Tr. 57).

Plaintiff testified she was seeing chiropractor Laura Vernallis at the River Chiropractic and Wellness Center and had seen her for several years. (Tr. 59). The chiropractic treatment helped with her pain "[i]n the beginning . . . but then over time" no longer helped. (Tr. 60). Plaintiff, however, continued to go because she "figure[d] it's probably better to go than not to go." *Id.*

*Relevant Medical Evidence*

On January 7, 2009, Plaintiff began treatment with Dr. Laura Vernallis, a chiropractor. (Tr. 193-94). Plaintiff reported left shoulder, low back, and bilateral knee pain. (Tr. 194). Plaintiff also reported her back problems began ten years earlier due to a herniated disc. *Id.* She stated working exacerbated her pain, and it was "sharp and shooting when she sits, bends and or [sic] goes from sitting to standing." *Id.* The pain was seven out of ten and "comes and goes on a daily basis." *Id.* Dr. Vernallis noted a lumbar x-ray revealed "diffuse lumbar disc degeneration" and "pelvic unleveling with the right side being higher than the left." *Id.* Dr. Vernallis diagnosed lumbar disc displacement, low back pain, sacroiliac pain, knee pain in joint, and pain in shoulder joint. *Id.* A few days later, Dr. Vernallis noted Plaintiff received "manipulation to SI" and "Cox flexion distraction of the complete lumbar region." (Tr. 195). Her "[p]lan of [a]ction" was one visit per week for six weeks, followed by two visits per month for one month. *Id.*

At her next appointment, Plaintiff reported improvement after her first adjustment. (Tr. 196). She also reported new "moderate intermittent aching low back pain" and "nominal shoulder pain". *Id.* On examination, Dr. Vernallis found "SI . . . to be subluxated with mild fixation at the joint" and "[m]otion palpation showed restriction of the joint on the right affecting SI." *Id.* Plaintiff received the same treatments as during her previous visit, and Dr. Vernallis noted "[h]er condition [was] responding satisfactorily." *Id.*

A few days later, at her next appointment, Dr. Vernallis noted Plaintiff was "feeling better and [was] now able to perform and workout without having to stop due to pain in the lumbar spine." (Tr. 197). She also reported "mild intermittent low back pain, which [was] slightly better since the last treatment." *Id.* Plaintiff also reported improvement in her shoulder and knee pain. *Id.* Dr. Vernallis noted Plaintiff's "condition [was] improving as anticipated". *Id.*

At a February 2009 appointment, Plaintiff reported her low back was "feeling good" but also reported "new symptoms of mild frequent shooting mid back pain." (Tr. 325). Again, Dr. Vernallis noted Plaintiff's "condition [was] improving as expected." *Id.* A few days later, Dr. Vernallis noted Plaintiff reported continued improvement, but "a little more lowback[sic] and left SIJ pain following a workout a few days ago, but pain did not last and resolved on its own." (Tr. 326). She also reported "mild occasional aching low back pain" which was "a little worse since her previous visit." *Id.* Again, Dr. Vernallis stated Plaintiff's "condition [was] improving as anticipated." *Id.*

Ten days later, Plaintiff reported "spikes of lowback[sic] pain and left SIJ pain this past week", but the "[p]ain resolved on its own". (Tr. 327). Dr. Vernallis found reduced motion in Plaintiff's lumbar spine, but again Dr. Vernallis noted Plaintiff was improving. *Id.*

At her next visit, Plaintiff had exacerbated symptoms of pain in the left sacroiliac joint that she reported developed after exercise. (Tr. 328). Plaintiff also had a new complaint of left knee pain, worsened by going up stairs. *Id.* Dr. Vernallis nevertheless noted Plaintiff's condition was improving. *Id.* Two weeks later, Dr. Vernallis noted Plaintiff "state[d] she feels good today." (Tr. 329). She had "some mild pain in the right SIJ but it is intermittent and rated 1-2 out of 10 when she is active, walking, exercising, etc." *Id.*

Plaintiff continued to treat with Dr. Vernallis through the remainder of 2009. *See* Tr. 330-41. In March 2009, Plaintiff switched from weekly visits to biweekly visits (Tr. 329), and in late April, Dr. Vernallis switched her to monthly visits (Tr. 331). She at times reported exacerbations of pain. *See* Tr. 331-32, 335 (April, May, and July 2009 treatment notes reporting exacerbation of pain following increased activity); Tr. 337-38 (August and September 2009 visits reporting pain in the left and right sacroiliac joints). At other times, she reported improvement, *see* Tr. 330 (April

2009 treatment note stating: "Anne feels good today . . . "[s]he has been active and is happy with her progress."); Tr. 334 (June 2009 treatment note stating: "[S]he is doing all her active ADLs and has had no problems."); Tr. 336 (August 2009 treatment note stating Plaintiff's neck and low back "felt good", and that she had "an occasional 'twinge' but nothing painful"). In her notes from most of these visits, Dr. Vernallis noted Plaintiff was "progressing" or "improving". *See* Tr. 330-38. In November and December 2009, her assessment was "[e]xacerbation." (Tr. 339-40). In late December, Dr. Vernallis noted Plaintiff's "condition [was] responding slowly". (Tr. 341). At that visit, Plaintiff had hip pain and Plaintiff was "discouraged about this pain that keeps her from doing the recreational activities that she enjoys so much." *Id.*

Plaintiff continued her treatment with Dr. Vernallis throughout 2010. (Tr. 342-58). In January 2010, Plaintiff was "[f]eeling better" with pain rated "an intermittent 2 out of 10 on the pain scale." (Tr. 342). Later that month, she had achiness in her mid to low back "after cardio and kick boxing", again "dull and achy and rated 2 out of 10." (Tr. 343). Five days later, she was "feeling better" with "sometimes some stiffness there following exercise, but there ha[d] been no pain since the last visit." (Tr. 344). She was still "feeling good" in February, with "no pain in the low back or either hip." (Tr. 345). In March, her low back pain was exacerbated, and was "constant and rated 2 out of 10 on the pain scale". (Tr. 346). She also had some shoulder and knee pain. *Id.* In April, Plaintiff was "feeling okay for the most part" with "just . . . some mild intermittent pain in the low back and in the left knee . . . and overall her pain is rated a one out of 10 on the pain scale." (Tr. 347). Plaintiff reported an exacerbation of pain after working out in May 2010. (Tr. 348). The pain was "constant and rated a moderate achy 5-6 out of 10 on the pain scale." *Id.* During this time period, Dr. Vernallis consistently reported Plaintiff was "progressing", "improving" or "responding". (Tr. 342-48).

At her next visit in May, Plaintiff was "discouraged about her low back pain and SIJ pain" which was "increase[d] each time Anne trie[d] to participate in recreational activities which she enjoys." (Tr. 349). Plaintiff reported her pain was "a constant dull ache rated 3-4 out of 10" and that the pain could "spike and become sharp and pinchy when she does certain movements like forward bending or twisting." *Id.* Dr. Vernallis noted Plaintiff's "condition [was] responding slower than expected." *Id.* Ten days later, Plaintiff returned, still discouraged, and reporting "nothing [was] helping." (Tr. 350). Her pain as "constant and rated 4-5 out of 10 and any activity only makes her feel worse." *Id.* Dr. Vernallis again noted Plaintiff's "condition [was] responding slowly." *Id.*

A little over a month later, Plaintiff reported she had improved since the previous visit. (Tr. 351). Her pain was no longer constant and "whe[n] present [was] only rated 1-2 out of 10 on the pain scale." *Id.* She had "modified her workout routine" and was swimming as her primary exercise, which she was able to do "without any exacerbation of low back pain and or [sic] SIJ pain." *Id.* Dr. Vernallis noted her condition was "improving as expected" and that she was "to contact our office only when further treatment is needed." *Id.* The next month, July 2010, Plaintiff was "feeling good" and was "pain[]free". (Tr. 352). She was "still swimming and not having any acute flare ups of pain." *Id.* Dr. Vernallis again noted Plaintiff was improving and should contact her when she needed further treatment. *Id.* Again in August 2010, Dr. Vernallis noted Plaintiff's "low back [was] feeling good". (Tr. 353). She had some neck pain, but it was "mild and intermittent and turning her head . . . just feel[s] tight, not painful." *Id.* Dr. Vernallis noted Plaintiff was "responding as expected" and should follow up monthly. *Id.*

In September 2010, Plaintiff went to Dr. Vernallis with an exacerbation of her low back and sacroiliac joint pain. (Tr. 354). She reported the pain began during house cleaning in which

she "ha[]d to bend and lift". *Id.* Her pain was "rated 2-3 out of 10 and [was] constant and achy." *Id.* Plaintiff, however, "state[d] the discomfort [was] getting better on its own, she [was] stretching and that [was] helping to ease the discomfort." *Id.* The following month, Plaintiff was "sore", and "better after her last treatment, but not as good as she had been feeling". (Tr. 355). Plaintiff reported she was "trying to exercise" and had "experienc[ed] some cracking in the low back" which was a new symptom. *Id.* Dr. Vernallis's notes indicate Plaintiff was "responding slower than expected." *Id.* In November, Plaintiff reported she had "felt great after her last treatment" but got worse when she "endeavored to work out again." (Tr. 356). Dr. Vernallis opined Plaintiff's condition was "improving satisfactorily." *Id.* In December, Plaintiff was "feeling good", and had done "her normal activities including cleaning and exercise and [was] happy with her progress right now." (Tr. 357). Later that month, Plaintiff presented with an exacerbation of her low back pain "following a deep house cleaning." (Tr. 358). Her pain was "constant . . . in the left and right SIJ that is achy and sharp with forward bending." *Id.* She also had left shoulder pain. *Id.*

Plaintiff also continued to treat with Dr. Vernallis in 2011. (Tr. 359-72). In January, Plaintiff had "some low back pain in the right SIJ" which was "intermittent and achy [and] rated 2-3 out of 10" and "more sore with activity as usual for her." (Tr. 359). In January and February, Plaintiff had acupuncture treatment for left shoulder pain. (Tr. 360-61). In March, she had an exacerbation of her low back and sacroiliac joint pain after "perform[ing] a workout on the elliptical trainer." (Tr. 362). In April, she was "feeling much better since her last treatment." (Tr. 363). Her "SIJs [were] hurting but pain [was] intermittent and very mild compared to last visit." *Id.* She also reported she was "exercising and the knee ha[d] not been an issue since [her] last visit." *Id.* In May, she was "feeling good", "[t]he mild achy feeling in the SIJs that was present last visit is gone", and her "[k]nees fe[lt] good and so [did] the shoulders." (Tr. 364). In June, Plaintiff

presented to Dr. Vernallis "visibly upset" after "an extreme exacerbation of pain that [was] terrible and rated a constant sharp 8 out of 10". (Tr. 365). The pain began following a workout two days prior and did not recede. *Id.* It was "mostly achy with some sharp and shooting pain upon certain motion." *Id.* Dr. Vernallis assessed an exacerbation of pain and recommended Plaintiff "possibly maintain a new set of lumbar films or seek the care of her PCP for the extreme exacerbation of pain she is experiencing this month." *Id.*

On June 14, 2011, Plaintiff saw to Samir J. Shaia, D.O., to evaluate her lower back pain. (Tr. 321-22). Plaintiff reported her low back pain radiated to both legs with the left greater than the right and that it had slowly and progressively worsened over the past three to four weeks. (Tr. 321). Plaintiff reported leading an "active lifestyle in which she goes on the elliptical and does many exercises". *Id.* Walking, sitting, and housecleaning exacerbated her pain. *Id.* She reported doing yoga. *Id.* On examination, Dr. Shaia found Plaintiff had an antalgic gait, but her tandem gait was normal. *Id.* Plaintiff's lumbar range of motion was restricted in flexion and extension, and she had a "[p]ainful arc of motion" in her low back. (Tr. 322). Lumbar spine x-rays showed "mild to moderate sclerosis of the sacroiliac joint left greater than right" and "degenerative disc space narrowing at L1-2". *Id.* Dr. Shaia diagnosed lumbar spondylosis, sacroiliac joint dysfunction and lumbosacral neuritis. *Id.* He noted Plaintiff had tried conservative treatment but still had significant discomfort. *Id.* Dr. Shaia ordered an MRI. *Id.*

Plaintiff returned to Dr. Vernallis six days later and reported she was "feeling better since her last treatment." (Tr. 366). She reported her "discomfort [was] mild and she [was] able to comfortably perform her ADLs and recreational activities." *Id.*

An MRI of Plaintiff's lumbar spine performed a few days later showed "[m]ild degenerative changes of the upper lumbar spine and small left lateral disk protrusion at L2-3." (Tr.

319-20). There was "no focal disk herniation or canal/foraminal stenosis" and the "lower lumbar levels [were] unremarkable." (Tr. 320).

Plaintiff returned to Dr. Shaia for follow up in July 2011. (Tr. 318). Dr. Shaia reviewed Plaintiff's MRI, and noted Plaintiff "continue[d] to have pain over her sacroiliac joints bilaterally" but "voice[d] no new complaints". *Id.* Dr. Shaia recommended Plaintiff go to physical therapy to "consist of core strengthening for improvement of range of motion and the development of a home exercise program." *Id.*

In August 2011, Plaintiff reported to a gastroenterologist that she exercised regularly and did yoga. (Tr. 205). The gastroenterologist also noted a normal gait. *Id.* Later that month, Dr. Vernallis noted Plaintiff "continue[d] to feel good" and did "not have any low back pain, just a little stiffness in her low back that is intermittent and only present early in the day and slightly after exercise." (Tr. 368).

In September 2011, Plaintiff reported to Dr. Vernallis "an exacerbation of low back pain following a fall on her back", which was "a 7 out of 10 and is constant, dull and achy." (Tr. 369). At a gastroenterology appointment that same month, notes indicate Plaintiff denied back pain, arthritis, and joint swelling. (Tr. 208). In October, Plaintiff told Dr. Vernallis she was "feeling much better" and "not having any residual from her acute flare up last month." (Tr. 370). She also had some neck pain that was "dull and achy and gets better as the[] day goes on." *Id.* In November Plaintiff reported pain in the sacroiliac joint on the left and right and pain in her gluteal muscles. (Tr. 371). The pain was "rated 3-4 out of 10 on the pain scale." *Id.* In December, Dr. Vernallis noted Plaintiff's "[b]ack and hip "were "feeling good." (Tr. 372). Plaintiff continued to treat with Dr. Vernallis through 2012 and into 2013. (Tr. 373-86)

Plaintiff next saw Dr. Shaia in February 2012. (Tr. 317). Plaintiff reported she had not gone to physical therapy, but "rather did home exercises" and "ha[d] been doing well until this past January" when "her symptoms have slowly and progressively worsened." *Id.* Dr. Shaia re-wrote a prescription for physical therapy and prescribed Lidoderm patches for the pain. *Id.* In April and May 2012, Plaintiff underwent epidural steroid injections. (Tr. 314-16).[1]

*Opinion Evidence*

In April 2013, state agency reviewing physician Bruce Mirvis, M.D., concluded there was "insufficient evidence to show detail about how the condition [mild degenerative disc disease of the lumbar spine and a small left lateral disc protrusion at L2-3] impacted the claimant's function or given any limitations in function during the [date last insured] period." (Tr. 76). In July 2013, state agency reviewing physician Diane Manos, M.D., reached the same conclusion. (Tr. 87). Therefore, neither doctor assessed Plaintiff's functional capacity. (Tr. 76, 87)

---

1. There is additional medical evidence in the record that post-dates Plaintiff's date last insured. The undersigned does not summarize this evidence herein because "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004). Record medical evidence from after a claimant's date last insured is only relevant to a disability determination where the evidence relates back to the claimant's limitations prior to the date last insured. *See Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir.1988) (medical evidence after date last insured was only minimally probative of claimant's condition before date last insured, so did not affect disability determination; *see also Begley v. Matthews*, 544 F.2d 1345, 1354 (6th Cir. 1976) ("Medical evidence of a subsequent condition of health, *reasonably proximate to a preceding time* may be used to establish the existence of the same condition at the preceding time.") (emphasis added). It is also apparent that post-date last insured evidence, to the extent that it relates back, is relevant only if it is reflective of a claimant's limitations prior to the date last insured, rather than merely his impairments or condition prior to this date. *See* 20 C.F.R. § 404.1545(a)(1) ("Your *impairment(s),* and any related symptoms, such as pain, *may cause physical and mental limitations that affect what you can do* in a work setting. Your residual functional capacity is the most you can still do despite your *limitations.*") (emphasis added); *see also Higgs,* 880 F.2d at 863 ("The mere diagnosis ..., of course, says nothing about the severity of the condition."). Thus, the undersigned only summarizes some of the evidence from the period immediately following the expiration of Plaintiff's insured status.

In December 2014, Dr. Vernallis completed a physical functional capacity form for Plaintiff. (Tr. 437-38). In it, she opined Plaintiff could lift or carry 10 pounds on an occasional or frequent basis.[2] (Tr. 437). She believed Plaintiff could stand or walk for less than two hours, and sit for about three hours in an eight-hour workday. *Id.* She thought Plaintiff could sit for twenty minutes before needing to change position, and stand for ten minutes before changing position. *Id.* She also opined Plaintiff would need to shift positions at will. *Id.* In response to the question "Will your patient need to lie down at times at unpredictable intervals during a work shift?", Dr. Vernallis wrote: "unknown." *Id.* To the follow-up question, "For what reason?", Dr. Vernallis wrote: "Hasn't been able to work since 2009." *Id.* Dr. Vernallis cited "[p]ain with activity, arthritis[, and] bursitis of right hip" as the medical findings to support these restrictions. (Tr. 438). Dr. Vernallis also thought Plaintiff would be limited to frequent reaching and occasional pushing/pulling due to "[e]xacerbation of pain", but would have no limitation on handling, fingering, or feeling. *Id.* Finally, Dr. Vernallis opined that Plaintiff's impairments or treatment would case her to be absent from work more than three times per month. *Id.*

### VE Testimony

The ALJ asked the VE to consider Plaintiff's past work. (Tr. 62). He testified that her past work at the cat shelter was a semi-skilled job performed at the medium level of exertion and her past work as a bakery clerk was a semi-skilled job at the light exertional level. *Id.*

The ALJ then asked the VE to consider a hypothetical individual with Plaintiff's age, education, and past work experience who can:

> occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; who can stand and walk six hours of an eight-hour workday; who can sit for six hours in an eight-hour workday[;] [p]ush and pull [as] limited as lift and/or carry [and] .

2. The form defined "occasional" as "no more than 1/3 of an 8 hr day" and "frequent" as "1/3 to 2/3 of an 8 hr day". (Tr. 437).

. . can occasionally climb ramps or stairs; can never climb ladders, ropes or scaffolds; can occasionally stoop, kneel, crouch and crawl.

(Tr. 63). The VE testified that such an individual could perform Plaintiff's past work as a bakery clerk, as well as additional jobs such as cashier, fast food worker, and packing line worker. (Tr. 63-64).

In her second hypothetical, the ALJ asked the VE to add an additional limitation that the hypothetical individual might be absent from work more than three times per month due to chronic pain. (Tr. 64). The VE testified that there would be no jobs for such an individual. *Id.*

For a third hypothetical, the ALJ asked the VE to assume a hypothetical individual with Plaintiff's age, education, and past work experience who could:

occasionally lift and carry ten pounds and frequently lift and carry five pounds[;] . . .stand and walk two hours of an eight hour workday[;] . . . sit for six hours of an eight-hour workday[;] . . . unlimited push and pull other than shown for lift and/or carry[;] . . . occasionally climb ramps and stairs[;] . . . never climb ladders, ropes or scaffolds[;] . . . [and] occasionally stoop, kneel, crouch and crawl.

(Tr. 65). The VE testified that such an individual could not perform Plaintiff's past work. *Id.* Given the hypothetical, the VE testified that such a person would be limited to jobs at the sedentary exertional level. *Id.*

***ALJ Decision***

In her written decision, the ALJ concluded Plaintiff met the insured status requirements of the Social Security Act through September 30, 2011. (Tr. 14). She concluded Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of March 1, 2009, through her date last insured. *Id.* Plaintiff had a severe impairment of lumbar disc displacement. *Id.* The ALJ concluded this impairment did not meet or equal a listed impairment (Tr. 15), and Plaintiff retained the RFC to perform:

light work as defined in 20 CFR 404.1567(b) except she is unlimited for pushing and pulling other than shown for lifting and/or carrying. She can occasionally climb ramps and stairs. She can never climb ladders, ropes, and scaffolds. She can occasionally stoop, kneel, crouch and crawl.

(Tr. 16). The ALJ then found, based on testimony from the VE, that Plaintiff was capable of performing past relevant work, or, in the alternative, that there were other job in the national economy Plaintiff was capable of performing. (Tr. 19). Therefore, the ALJ concluded, Plaintiff was not disabled from her alleged onset date of March 1, 2009, through September 30, 2011, her date last insured. (Tr. 20).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

4.    Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

Plaintiff alleges the ALJ: 1) erred in her RFC evaluation; and 2) failed to give proper weight to Dr. Vernallis's opinion. The Commissioner responds that the ALJ did not err, and her decision is supported by substantial evidence.

At the outset, the undersigned notes the relevant time period is March 1, 2009 (Plaintiff's alleged onset date) through September 11, 2011 (Plaintiff's date last insured). To qualify for DIB, Plaintiff must establish disability within this time period. 42 U.S.C. § 423(c); 20 C.F.R. § 404.130.

### *RFC Determination*

Plaintiff challenges the ALJ's RFC determination, and contends it was error to find her capable of light work. This is so, she contends, because the ALJ "misconstrue[d], or wholly ignore[d] much of the evidence that would support a very different conclusion." (Doc. 13, at 5). In essence, Plaintiff contends the ALJ only considered the evidence that supported her ultimate conclusion and ignored evidence to the contrary, and that the evidence supported a limitation to sedentary work.[3] The Commissioner responds that the ALJ's RFC determination is supported by substantial evidence.

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence *Id.* § 404.1529. While an ALJ must consider and weigh medical opinions, the RFC determination is expressly reserved to the Commissioner. *Ford v. Comm'r of Soc. Sec.*, 114 F. App'x 194, 198 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(e)(2), 404.1546.

---

3. Had Plaintiff been limited to sedentary work, she would have been deemed disabled by application of the Medical Vocational Grids, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 201.14.

At the outset, it is worth reiterating that the Court must affirm "so long as substantial evidence also supports the conclusion reached by the ALJ" even if substantial evidence or indeed a preponderance of the evidence *also* supports a claimant's position. *Jones*, 336 F.3d at 477.

Here, as the ALJ first pointed out, Plaintiff's "medical treatment was conservative and not of one who is totally disabled and unable to perform any kind of work activity." (Tr. 16). This is supported by the record. Plaintiff primarily sought treatment from a chiropractor, initially weekly, and quickly tapering off to monthly visits. *See* Tr. 193-97 & Tr. 325-29 (roughly weekly visits from January 2009 through March 2009); Tr. 331 (Dr. Vernallis's April 2009 note that she would switch Plaintiff to a schedule of monthly visits); Tr. 331-86 (treatment notes from roughly monthly visits from April 2009 through September 2011). *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727 (6th Cir. 2013) ("The ALJ's finding [that the claimant has the physical RFC for the full range of light work] is supported by the evidence in the record that his treatment was minimal and conservative during the period at question . . . ."); *see also Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016) ("The ALJ noted that the records indicate Kepke received only conservative treatment for her ailments, a fact which constitutes a 'good reason' for discounting a treating source opinion.").

Second, the ALJ also summarized some of Plaintiff's visits with Dr. Vernallis. (Tr. 17-18). As discussed in the factual background, a review of those records reveals periods of stability or improvement with some exacerbations. Plaintiff argues the ALJ only addressed the positive notations in the record, while ignoring the negative notations. An ALJ need not discuss every piece of evidence in the record so long as she considers the record as a whole. *Rudd*, 531 F. App'x at 730. The ALJ's ruling stated several times that she considered all of the evidence in the record (Tr. 12, 16), and the Court accepts that she did so as long as her conclusions are supported by the record

as a whole. *See Rudd*, 531 F. App'x at 730 ("the ALJ was not required to discuss all the evidence, as long as her factual findings as a whole show that she implicitly considered the record as a whole"); *Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) ("Neither the ALJ nor the Council is required to discuss each piece of data in its opinion, so long as they consider the evidence as a whole and reach a reasoned conclusion"); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (quoting *Loral Defense Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). Although the pattern of Plaintiff's symptoms certainly suggests ongoing problems, the record as a whole suggests periods of stability and improvement with occasional exacerbations. Notably, at the majority of Plaintiff's chiropractor appointments, Dr. Vernallis assessed her as "improving", "progressing", or "responding" to treatment. *See* Tr. 327-38, 342-48, 351-53, 356-59, 362-64, 366, 368, 370-72.[4] Additionally, as the ALJ pointed out, Plaintiff herself frequently reported improvement. *See* Tr. 17 (citing, *inter alia*, Tr. 196 (January 2009 note that Plaintiff "felt better after her first adjustment"); Tr. 197 (January 2009 note that Plaintiff was "able to perform and workout without having to stop due to pain in the lumbar spine"); Tr. 331 (April 2009 note that Plaintiff "has been active and is happy with her progress"); Tr. 336 (August 2009 note that Plaintiff stated she felt "an occasional 'twinge' but nothing painful"); Tr. 352 (July 2010 note that Plaintiff was "pain[]free", and "not having any acute flare ups of pain"); Tr. 334 (July 2009 note that Plaintiff was "doing all

---

4. In contrast, at isolated times, Dr. Vernallis provided more negative assessments. (Tr. 339-40) (assessing "[e]xacerbation in November and December 2009); (Tr. 341) (noting Plaintiff's condition was "responding slowly" in late December 2009); (Tr. 349-50) (noting Plaintiff's condition was "responding slowly" in May 2010); (Tr. 354) (assessing "[e]xacerbation" in September 2010); (Tr. 355) (noting Plaintiff's condition was "responding slower than expected" in October 2010); (Tr. 365) (assessing "[e]xacerbation of pain" in June 2011); (Tr. 369) (assessing "[e]xacerbation of pain" following a fall in September 2011).

her active [activities of daily living] and has had no problems"); Tr. 357 (December 2010 note that Plaintiff was "feeling good" and "did her normal activities including cleaning and exercise and is happy with her progress"); Tr. 366 (June 2011 note that Plaintiff's discomfort was "mild" and she was "able to comfor[tab]ly perform her [activities of daily living] and recreational activities.")).

Similarly, the ALJ cited examples from the record of Plaintiff's activities, which she noted to be "consistent with her conservative treatment." (Tr. 17) (citing Tr. 330 (April 2009 note that Plaintiff had "been active"); Tr. 334 (July 2009 note that Plaintiff was "doing all her active [activities of daily living]"); Tr. 335 (July 2009 note that Plaintiff had low back and neck pain "following a busy day of exercise and work"); Tr. 339 (November 2009 note that Plaintiff used her "pilates reformer for the first time on Sunday" and it aggravated her low back); Tr. 343 (January 2010 that Plaintiff's "mid to low back [was] achy after cardio and kickboxing"); Tr. 351 (June 2010 note that Plaintiff "modified her workout routine" and was swimming without pain); Tr. 352 (July 2010 note that Plaintiff was "still swimming" without pain); Tr. 366 (June 2011 note that Plaintiff was "able to comfortably perform her [activities of daily living] and recreational activities")). Although some of these activities led to an exacerbation of Plaintiff's pain, the fact that she was able to engage in these activities lends support to the ALJ's conclusion that Plaintiff was not completely disabled.

Third, the ALJ summarized the findings of Plaintiff's treatment with Dr. Shaia. (Tr. 17). As the ALJ noted, at her June 2011 visit, Plaintiff reported to Dr. Shaia that she "lead[s] an active lifestyle in which she goes on the elliptical and does many exercises" and that she "does yoga." (Tr. 321). Plaintiff contends the ALJ did not thoroughly summarize Dr. Shaia's notes that Plaintiff had an antalgic gait, restricted range of motion, and that, despite conservative treatment, Plaintiff "continue[d] to have significant discomfort". (Tr. 322). These findings are in Dr. Shaia's

examination notes. (Tr. 321-22) (identifying antalgic gait, lumbar range of motion "restricted in flexion and extension" and "[p]ainful art of motion" in the low back"). As stated above, however, an ALJ is not required to "discuss each piece of data" so long as she "consider[s] the evidence as a whole and reach[es] a reasoned conclusion." *Boseley,* 397 F. App'x at 199. Additionally, the ALJ went on to note that at a follow-up appointment with Dr. Shaia in February 2012, Plaintiff reported "[s]he was doing well until this past January when her symptoms slowly worsened." (Tr. 17) (citing Tr. 317). This was consistent with Plaintiff's ongoing treatment with Dr. Vernallis. Just six days after her initial appointment with Dr. Shaia, Plaintiff reported to Dr. Vernallis that she was "feeling better", her "discomfort [was] mild" and she was "able to comfortably perform her [activities of daily living] and recreational activities." (Tr. 366); *see also* Tr. 368 (August 2011 note that Plaintiff "continue[d] to feel good" and did "not have any lower back pain, just a little stiffness in her low back that is intermittent and only present early in the day and slightly after exercise."); Tr. 369 (note indicating exacerbation of back pain after a September 2011 fall); Tr. 370 (October 2011 treatment note that Plaintiff was "feeling much better" and "not having any residual from her acute flare up last month."); Tr. 372 (December 2011 note that Plaintiff's "[b]ack and hip" were "feeling good".)

Additionally, the undersigned notes that the ALJ did not find Plaintiff could perform a full range of light work, but rather imposed further restrictions to account for her back impairment: occasionally climbing ramps and stairs, never climbing ladders, ropes, and scaffolds, and occasionally stooping, kneeling, crawling, and crouching. (Tr. 16).

Together, this evidence supports the ALJ's conclusion that Plaintiff was capable of, at most, a limited range of light work. *See* 20 C.F.R. § 404.1545 (by definition, the RFC is the most a claimant can do). Although Plaintiff may take a different view of the record, and can point to

evidence in support of her argument, there is—at the same time—substantial evidence in the record to support the RFC decision reached by the ALJ. *See* Jones, 336 F.3d at 477. As such, the Court must affirm.

### Dr. Vernallis's Opinion

Within her challenge to the ALJ's RFC determination, Plaintiff alleges the ALJ should have given greater weight to Dr. Vernallis's opinion. The Commissioner responds that the ALJ properly evaluated that opinion. As discussed below, the undersigned agrees with the Commissioner and finds the ALJ did note err in her evaluation of this opinion.

Social Security regulations state that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). A "medical opinion" is defined by regulation as a "statement[] from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairments . . . ." *Id.* at § 404.1527(a)(2). "Acceptable medical sources" includes licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. *Id.* at § 404.1513(a)(1)–(5). The relevant Social Security Regulation also explains:

> The distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons. First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. See 20 CFR 404.1513(a) and 416.913(a). Second, only "acceptable medical sources" can give us medical opinions. See 20 CFR 404.1527(a)(2) and 416.927(a)(2). Third, only "acceptable medical sources" can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight. See 20 CFR 404.1527(d) and 416.927(d).

> Making a distinction between "acceptable medical sources" and medical sources who are not "acceptable medical sources" facilitates the application of our rules on establishing the existence of an impairment, evaluating medical opinions, and who can be considered a treating source.

SSR 06–03p, 2006 WL 2329939, at *2. Opinions from those who are not "acceptable medical sources"—or as the regulations define them, "other sources"—may be used by an ALJ to "show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. § 404.1513(d); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). Other source opinions are entitled to consideration by an ALJ, and an ALJ's decision should reflect such consideration. *Cole v. Astrue,* 661 F.3d 931, 939 (6th Cir. 2011); *see also* SSR 06–03p, 2006 WL 2329939, at *3 (opinions from "other sources" "are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file"). In other words, an ALJ "should explain the weight given to [such] opinions . . . or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06–03p, 2006 WL 2329939, at *6; *see also Cruse,* 502 F.3d at 541.

However, "SSR 06–03p . . . does not require that an adjudicator articulate 'good reasons' for the rejecting of an 'other source's' opinion [,]" as the ALJ must do when discounting an opinion by a treating source. *York v. Comm'r of Soc. Sec.,* 2014 WL 1213240, at *5 (S.D. Ohio) (citations omitted); *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. 2014) ("An ALJ must consider other-source opinions and 'generally should explain the weight given to opinions for these 'other sources[.]'") (alteration in original). To evaluate other source opinions, an ALJ may apply the factors set forth in 20 C.F.R. § 404.1527(c), *i.e.,* length of treatment history; consistency of the opinion with other evidence; supportability; and specialty or expertise in the medical field related to the individual's impairments. *Adams v. Colvin*, 2014 WL 5782993, at *8 (S.D. Ohio); SSR 06-

03p, 2006 WL 2329939, at *4 ("[T]hese same factors [in 20 C.F.R. § 404.1527] can be applied to opinion evidence from 'other sources.'").

The ALJ did consider and weigh Dr. Vernallis's opinion. In so doing, the ALJ stated:

Some weight is given to the Physical Residual Functional Capacity Assessment by Laura Vernallis, D.C. dated December 10, 2014. The undersigned agrees with all assessments in the report that are consistent with a light functional capacity. However, the opinion was offered after the claimant's date last insured for disability benefits and Dr. Vernallis does not indicate for what period the assessment applies.

\*\*\*

Dr. Vernallis stated the claimant had not been able to work since 2009 (Ex. 14F, p.2). This statement is not supported by her treating notes prior to the claimant's date last insured. Also, an opinion that a claimant is "unemployable" involves consideration of vocational issues and is reserved for the Commissioner of Social Security, or to the Commissioner's designees, to resolve pursuant to 20 CFR 404.1503 and 404.1527(e).

(Tr. 18-19).

Plaintiff acknowledges Dr. Vernallis—a chiropractor—is an "other source" under the regulations. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, (6th Cir. 1997) (chiropractor not an "acceptable medical source" within the meaning of the regulations therefore "ALJ has the discretion to determining the appropriate weight to accord a chiropractor's opinion based on all the evidence in the record"); *Schmiedebusch v. Comm'r of Soc. Sec. Admin.*, 536 F. App'x 637, 648 (6th Cir. 2013) ("Chiropractors are not a listed medical source who can provide evidence to establish an impairment, *see* 20 C.F.R. § 404.1513, and ALJs are not required to give weight to a chiropractor's opinion.").

The ALJ provided two reasons for discounting Dr. Vernallis's opinion. First, the functional capacity assessment was completed in December 2014 (over three years after Plaintiff's date last insured), and does not state what time period Dr. Vernallis was addressing. (Tr. 18). Plaintiff argues this reasoning is incorrect because "review of Dr. Vernallis's assessment reveals that she

clearly states that Plaintiff's condition has imposed these limitations since 2009." (Doc. 13, at 7) (citing Tr. 437-38). The undersigned, however, finds the ALJ's statement supported by substantial evidence. At one point in the functional capacity assessment, in response to the question "Will your patient need to lie down at times at unpredictable intervals during a work shift?", Dr. Vernallis wrote: "unknown." (Tr. 437). To the follow up question, "For what reason?", Dr. Vernallis wrote: "Hasn't been able to work since 2009." *Id.* Dr. Vernallis's answer, therefore, implies she does not know whether Plaintiff would need to lie down during work because Plaintiff has not worked in that time period. The undersigned therefore finds Plaintiff's statement that the assessment "clearly states that Plaintiff's condition has imposed these limitations since 2009" (Doc. 13, at 7), unsupported. Moreover, even if this is read as a broader statement that Plaintiff has been "unable to work" since 2009, Dr. Vernallis's opinion does not clearly state that all the restrictions listed applied during the relevant time period. Further, to the extent Dr. Vernallis did opine Plaintiff was "unable to work", such a statement is not entitled to any deference, as the ALJ recognized. *See* Tr. 18-19; 20 C.F.R. § 404.1503.

Second, the ALJ stated Dr. Vernallis's statement that Plaintiff has been unable to work since 2009 "is not supported by her treating notes prior to the claimant's date last insured." (Tr. 18). For the same reasons discussed above with regard to Plaintiff's RFC argument, this statement is also supported by substantial evidence. Dr. Vernallis's records during the relevant time period show periods of exacerbation surrounded by periods of stability or improvement. *See* discussion *supra*.

The ALJ explained she did not give full weight to Dr. Vernallis's opinion because it was completed after Plaintiff's date last insured, did not specifically identify the time period for which she addressed restrictions, and because it was not supported by Dr. Vernallis's own treatment

records. For the reasons explained above, the undersigned finds the ALJ's discussion of Dr. Vernallis's opinion satisfies the requirement that she "should explain the weight given to [such] opinions . . . or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06–03p, 2006 WL 2329939, at *6; *see also Cruse,* 502 F.3d at 541. As such, the ALJ did not err in her analysis of Dr. Vernallis's opinion.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence, and therefore affirms Commissioner's decision.

 s/James R. Knepp II
United States Magistrate Judge